Debbie Branscom, Plaintiff's Defendant You were saying before that noise that the facts of what happened aren't in dispute. It does seem to me that the city does dispute that. I was a bit taken aback by their discussion of facts in their brief that only takes the side of the officer and saying that's what happened. Why do you say that the facts are settled in this case? It seems to me we do have different viewpoints. Maybe credibility looks strongly on the side of your client, but there is another viewpoint that was expressed. How do we know what really happened out there? I think, Your Honor, I was referring to the fact that Officer Fierro's account of what happened there on the scene that day is contradicted by absolutely everyone else who was present on the scene. Well, only, unfortunately, the deceased, it seems to me, and you tell me, is it true that only the deceased and the officer witnessed the whole event from start to finish and the other people sort of came into it at different points? Yes. So what actually initiated it, who ran whom off the road, you really would have to have seen the whole event to know when it started and who initiated it. I think the deceased is a very sympathetic victim in this case, but that is reading the evidence in a certain light, and that does seem to me the more credible light. But anyway, that is an observation, and I wanted your reaction as well, though, to how do we truly know what happened out there? And you're right, Your Honor. As far as what actually triggered this series of events, we don't know. Only Officer Fierro knows and Mr. Lively, who can't tell us. It's after the witnesses come in that all of the eyewitnesses to the driving erratically all said that Officer Fierro was the one who was the aggressor. And then once he had pulled Mr. Lively over, all of the responding officers all unanimously agreed that Mr. Lively was pinned against his truck and Officer Fierro was standing there right in his face screaming at him. That's not central to the case. You can move on. Your Honors, in the past month, we have seen violence by police officers against civilians and by civilians against police officers, and certainly there is absolutely no justification for violence against a police officer. But apart from that, Your Honors, there's a tremendous amount of resentment out there in the public because they don't feel that police officers in cities are being held accountable for the bad actions of a few. And Dallas Police Chief Brown was interviewed right after his officers died a few days later by CNN, and he said something that's relevant to this case, Your Honors. He praised his officers, of course, but he said, quote, there's cops that don't need to be cops, and I've been the first to say we need to separate employment with those types of cops, one or two percent. And in this case, Your Honor, Officer Fierro was clearly one of the one or two percent that should not have been a police officer. And after he pleaded guilty to the criminal charges, the Livesey family agreed to let him have probation rather than a five-year prison sentence, five-year minimum prison sentence, if he would surrender his peace officer license forever, and he did that, so he can't ever hurt anyone else like that again. There's no doubt that the facts in this case, as with many of these 1983 cases, the facts are egregious. I mean, they're just tough, but you have to . . . and even assuming some version of facts that would be more favorable to your side, the Supreme Court's law in Brown and our whole strew of cases, I mean, that's your hurdle. So with respect to factual dispute or even take them in that light, I mean, that is, as the magistrate just said, I mean, it is a substantial hurdle. So the question for us, one, is what do you do about Brown and those cases? I mean, why, if at all, is this case different? Because if you don't get over that hurdle, even if the panel were otherwise attuned to your factual arguments, that's the law of the circuit, that's the law from the Supreme Court. So how does your case mesh with the Brown line of cases? I mean, that was the basis that the district court, you know, ruled against you, that . . . on the training, et cetera. Ms. Baird. And certainly, Your Honor, the magistrate judge applied the law as he believed the precedents required, but we believe there is a very narrow path, we acknowledge that, but there is a narrow path. And the Supreme Court could have but did not forever foreclose the possibility of a hiring case. They decided that in that particular case, the facts weren't there, but they did not foreclose that there could be a hiring claim. And one of the cases that I discussed with the magistrate judge on summary judgment was there's a case in the Eleventh Circuit called Griffin v. Opalaca, City of Opalaca, and it was not . . . it did not involve a police officer, so the facts weren't analogous, but the plaintiff did win a jury verdict on a hiring claim, went to the Eleventh Circuit, it was affirmed, went to the Supreme Court, they denied cert on it. So that gave the Supreme Court another opportunity to say if they would have granted it and made an opinion on it, that there was no such thing as a hiring claim, but they haven't done that. But Brown makes clear the Supreme Court was extremely concerned about respondeat superior, and they've said as much about ten different ways, and I understand that. But in this case, Your Honor, we believe that it's the actions of Chief Mitchell and the City of Malakoff that are at issue, not the respondeat superior, just for Officer Fiero's actions. And, Your Honor, really there are two questions that I raised with you today, and the first is, in my brief, I raised the question about what level of screening is necessary, what is an adequate level of screening, and Brown talks about that repeatedly, Your Honor, adequate screening, and we don't believe that's what occurred here. It was rather more of a dog and pony show. Officer Fiero gave Chief Mitchell unlimited access to his personnel and disciplinary records, and Chief Mitchell talked to a personnel clerk at the City of Dallas, didn't talk to anyone else about him, and with the City of Ferris, where he'd just been fired, he meets with the chief for less than ten minutes, he doesn't ask for any documents, not a single piece of paper on him, and he never asked, well, would he make a good officer, or did you have any problems with him? . . . There are cases you're blind in the teeth of that raise those facts, and the court has said, even if greater inquiry, in hindsight, should have been made, et cetera, et cetera, the cases say, no liability for not having made the extra inquiry, not having gotten any information. That's the argument I'm making in the brief. The other side, so I said, I mean, so I'm still saying, how do you get . . . I hear your argument, but I'm saying, how do you differentiate from cases that have addressed that before and said that, even if it later was shown that asking the other questions would have disclosed more information about the person's background, the cases say you still can't get down to hiring. In this instance, how are you getting into, whatever the narrow path you say is there, help me understand what that pathway is in between these cases. . . . I think, Your Honor, it's the fact that the argument that's been made by the defendants is they did not have to do any screening, none at all. And we raise this case, honestly, to test what that means. Is that really the law of the circuit, that when you equip someone with a badge and a gun and you send them out there to use potentially deadly force on someone, whether they really don't have to do any screening on an officer? Well, counsel, when you say none, I mean, it seems to me that there was some. But this case is too similar to his Brown itself versus Brown County or whatever it was in Oklahoma, where the Supreme Court said it is arguable that better investigation of this son, nephew, or whatever of someone else should not have been hired as a policeman. Still based on what was found, not on what could have been found by a better investigation, there was no liability.  Well, Your Honor, in Brown, there wasn't the precise constitutional violation in the young man's past that there was here. And that's why what happened in the city of Ferris is relevant for us in that he'd just come from a position where he had used excessive force on an arrestee, different kind of excessive force. He literally beat the young man, threw him to the ground, put his knee in his back and twisted his arm. Well, are you arguing because of this constitutional violation that that changes, it's almost no longer an obligation of the hiring department? It's almost per se that you have, if there's that kind of violation in the policeman's past, that overcomes any kind of shortcoming in the investigation and it must be found or it must be evaluated by a fact finder later as a disqualifier? I just don't understand the importance of what wasn't found. If it's a particularly serious thing that wasn't found or a less serious thing that wasn't found, it seems to me the law still looks at it from the viewpoint of the hiring law enforcement agency and says a minimum investigation is all that has to be done. I mean, I'm not trying to say that's good law or not. It does seem to be the law, though. Yes, Your Honor. I mean, is it or is it not? I mean, are you trying to focus on the nature of his prior violation as somehow changing the rules? Not changing the rules, Your Honor, but it's just, as you said, it does distinguish Brown and it distinguishes the fact that under the facts of Brown, they didn't get there because the two violations were not similar enough. And here we have a pattern of identical violations. And whether that ultimately makes a difference to the court, Your Honor, as I say, the reason that we raise the case is that because they are so similar and there was an identical violation in the officer's very recent past, whether essentially that would foreclose a hiring claim if that's the case, Your Honor. I guess you also have to balance that with the fact that he was a certified law enforcement officer. So he'd been commissioned or whatever it is by the state of Texas as a law enforcement officer. So it wasn't like a total person off the street. You had someone that had received some training and was certified as a police officer. Your Honor, balance that out with his prior acts, but at least there was some grounds for employing him or hiring him that made him qualified. It made him qualified in the global sense, Your Honor, but the city of Dallas fired him not once, but twice, and the city of Ferris fired him as well. So again, it goes all back to the point of he committed these violations at both places. In Dallas, I acknowledge, Your Honor, that they were unsustained or not sustained, but that's the other point I was raising is what is a sustained complaint? The defense have argued that sustained can only mean that literal word be applied to a particular set of facts. And our argument also, Your Honor, was that if you have a videotape, I have a videotape that shows to any observer the incident excessive force, then you have a witness in the city who has excessive force, a witness that says, yes, I saw it, the young man was complying with instructions and he still threw him down on the ground, and then Chief Love's letters about that, and then you've got Chief Love verbally reprimanding him. So that's part, again, of what we were seeking a finding on, Your Honor, is whether it's only the word sustained or whether other kinds of evidence can be regarded as substantiated findings of excessive force or substantiated findings. And, Your Honor, all of the claims, the additional claims, are all based on the same set of series of facts. I've only addressed the hiring claim, but all of the claims together follow from the same thing. So I rest on my breathing on that, Your Honor. Thank you. All right. Thank you, Ms. Bransman. You've reserved a bow. Mr. Vinson, on behalf of the city. Lance Vinson for the defendants. May it please the Court. Thank you. Your Honors, I think that you'd be surprised if I took any other position than to say that the district court's ruling was supported by over 40 years of well-established municipal liability law. The situation in this case, as I think the record shows, is that I think the key element here is that Mr. Fierro, in his past, when Officer Fierro was hired by the City of Malacawe, his past record was investigated. In fact, it was investigated by Chief Mitchell. And in his record, which included employment with the City of Ferris, with the City of Dallas, one of the largest police forces in the country, and with the City of Dallas District Attorney's Office, he had absolutely no prior sustained conviction or sustained complaints of either excessive force or unlawful arrest. These are the key issues here. He had a number of other claims and a number of other issues that he had been found responsible for, such as reckless driving of a police patrol unit and various things along those lines. He had been, in fact, disciplined for writing false reports. But at no point in time did he, when investigated by the Internal Affairs Department of the City of Dallas Police Department, did they ever find or sustain an excessive force claim against him. He was employed for approximately eight years. And when Chief Mitchell, I think the record will show that certainly Chief Mitchell did some investigation of the background of Officer Piero before he hired him. There's never been an argument made in this case, nor is it our position today, that he should not have had to do anything. Is it clear from the record what Chief Mitchell found? Was he aware of all the incidents that plaintiffs are talking about, including the claims were not sustained? Is that settled on this record? I think that what he had at that point in time, and I think what is decisive in the case, is, as I recall, record on appeal, I think pages 1304 and 1305, are the documents that he had in hand whenever he appeared. He showed up at the Dallas Police Department. Documents that Piero had? Documents that Mitchell had that showed Piero's background and his findings under investigation with the city of Dallas. Not only did it show what his offenses were, what his disciplinary issues were, but it also showed what his credentials were, what his awards were, and all those things. It was, in essence, a resume. What it showed was that over eight years of doing patrol duty in downtown Dallas, that he had been accused of unlawful arrest on one occasion, and he had been accused of excessive force several times. They had all been investigated, and each of those had been investigated by the Internal Affairs Department. Now, as the case of Brown states, anything that is not sustained, that is not similar or not sustained, is not something that should be considered, because otherwise, we do exactly what we're always avoiding doing in municipal liability cases, and that is falling back on respondeat superior. What these cases showed, what his resume showed that Officer Mitchell had, or Chief Mitchell had in hand, was that the excessive force claims that had been investigated had been found to be inconclusive. In other words, they were not sustained. They were not substantiated. Now, counsel has made an argument in her brief that these findings of inconclusive should be somehow considered as substantiated claims because they weren't altogether found to be without basis. Further investigation of the investigations done by the Internal Affairs Department would show that many of these, on these excessive force cases, the reason that they were found to be inconclusive is because it came down to a variation of what the stories were on drug arrests and those types of things. One in particular, when one of, it was a heroin arrest, and one of the, as the suspect was trying to swallow the heroin rocks, they took him to the ground, the officers did, Officer Piero was one of those, and the, I think the suspect spit the rocks out, he was arrested and then charged, and he told a different story about what happened that evening than Officer Piero and his partner did. Nonetheless, the Internal Affairs investigator found that it was inconclusive. There was one unlawful arrest charge in the Dallas PD that was, in fact, originally sustained. And it had to do originally with a domestic fight, basically, between a boyfriend and girlfriend, and Officer Piero and his partner went to the scene and placed her under arrest. She was originally arrested for assault of her boyfriend. She was then, as they were being, as she was being arrested, the boyfriend decided that he didn't want to press charges, and so they changed the charge to public intoxication. She was, they ultimately decided that she was not safe to be left on the street that night and went ahead and arrested her for public intoxication and put her in jail. But the, later on, that sustained unlawful arrest claim was reversed. It was rescinded by a subsequent Internal Affairs investigation. Let me ask you, what role did the City Council, or did the City Council play in the hiring and firing of police officers? I think that the primary role that it played is that it gave Chief Mitchell, when he went to the Dallas Police Department, and let me point out that he made a personal visit to the Dallas PD Administrative Office, that was what he was given at the time. And that provided him with a summation of what Officer Fierro's employment history was. The important thing is that it showed no, it showed no sustained claims, substantiated claims for excessive force or unlawful arrest, and that's where it comes, becomes very important in this case. So, was he hired by the City Council or by the Chief of Police, or a combination of both, or who did the hiring and firing in the city, as far as police officers were concerned? The Police Chief made the decision to hire, but the Police Chief, as we point out in our brief, was not actually the policymaker for the City of Malacca. The City Council, which is the city policymaker by state law, as set forth in the Texas local government code, is the actual policymaker that had to approve of the hiring. But Chief Mitchell made the decision that, based upon what he saw in that resume that he was provided that day, that internal affairs resume, that Fierro would make an acceptable candidate. And, Counselor, you talk about this being, in your brief, talks about this being the setup that the City Council has ultimate decision-making authority, or policymaking authority can override decisions. There's an affidavit from someone that says that the City Council has overridden hiring decisions in the past, I think is what the affidavit says. Is that all the evidence we have of the City Council's role? Is that fleshed out any, what hiring decisions were overridden? Was there one, and there was very special circumstances? Do we know anything other than that conclusory statement? That's the wrong label for it, probably, but that ... Well, the affidavit that you're speaking of, Your Honor, is the affidavit of City Administrator, City Manager, Ann Barker. And what Ann Barker's affidavit presented was in conjunction with the City Charter that sets out the powers of the governing body, the City Council. And the point that we were trying to make in presenting that affidavit was simply this, that there has been, that state law clearly establishes who the policymaker of the City of Malakoff is. There had been no, there has been no evidence presented in this case by the plaintiffs that the City Council was involved in any way in any deliberate indifference or any conduct that would impose some sort of Monell liability upon them. And we were attempting to point out by the affidavit, the testimony of Ann Barker, that there's been nothing done by way of ordinance or any other ruling by the City Council that is making authority to the police chief. Counselor, the role of the affidavit is clear enough. The question really goes to the role of the Zorno case in this, Wichita Falls, in this matter. I don't know if Zorno is a particularly well-written opinion, but it does talk about the ability in our evaluation to decide if, in fact, a police chief has been delegated implicitly final decision-making authority on the relevant activity, and here it's the hiring of a police officer. So what I was trying to get into is what evidence is there that the City Council has taken any role in hiring decisions of police officers, other than this, I just can't think of a better word, I'll use it again, conclusory statement that some decisions have been overwritten in the past. What evidence is there? You're saying there's nothing to counter it. That's fine. Maybe that's all we need. But just answer my question. What evidence is there of how the City Council has ever affected a hiring decision by the chief? None that I'm aware of, Your Honor. And what do you think of the whole concept that can be an implicit delegation of policy-making authority to the police chief? Well, I think that delegation of policy-making authority is one thing that City Councils, having dealt with them for many years, have to be very careful about, and I think that it is a question which delegation requires some sort of either a long-standing practice or an actual written delegation. In this case, we have no evidence that there was any delegation. So to say that the City Council delegated policy-making authority to Police Chief Mitchell, in my opinion, I don't think there is any evidence of that. Would you consider Zorno an outlier? Is it not fairly represent what the law in this circuit is? Excuse me, sir? Would you consider Zorno to be an outlier? I do think it's an outlier, and I think it's an outlier for this reason, because number one, Zorno involved, as I recall, a home rule city. The city of Malakoff is a type A general law city, and the rules that govern the governing bodies of these two different types of cities are set forth in the Texas Local Government Code in great detail. And I think that Zorno deals with a home rule city that had specific and particular delegations and variations in its city charter and city policies that are significantly different from what the city of Malakoff had. I can't recite those, but I know that it is a home rule city case. It's also Zorno was a dealt, the quote that was spoken just a minute ago, it has to deal more with a training issue, with the issue of the training of an officer. In this particular case, there has been absolutely no evidence that Officer Fiero, who was a masterpiece, master-certified peace officer in Texas, that is the highest level of certification. Under the Benavides case, and I believe under Lamone v. Balcones, there is a longstanding law that provides that when a police officer meets the state standards for training, that in order to prove that he has no insufficient training in order to support a training claim, the plaintiff has to show and has to produce evidence that the state of a particular area of deficiency and that why that state training provided in that area is deficient. There is absolutely none in this case. I'm satisfied with your answer. You don't need to pursue that any further, thank you. I think, Your Honor, the problem with this case is simply this, that what the plaintiff is trying to persuade the court to do is to take a look at the meaning of what these terms mean in the City of Dallas Internal Affairs Investigation Report and to somehow construe, take the term inconclusive and do a large reevaluation of these claims to determine whether, in fact, they should have been substantiated or not and to give some kind of credibility to these claims that were in the report and labeled inconclusive, to somehow consider those as being sustained because, as the court is well aware in a long line of cases, including the Stokes v. Bullins case, the Davis v. City of North Richland Hills case, Gross v. City of Grand Prairie, the court has repeatedly held that in order to, in a review situation, a hiring situation, or even a training situation, in order for the court to, or the police chief, the deputy sheriff, to consider prior claims in determining whether, in fact, the connection of the background of this officer is close enough that he presents a high risk of committing this specific type of constitutional violation, those prior claims must be sustained. They must be substantiated. And where they're not, it drives us and we run a particular risk in the hiring cases such as this of breaching that long-standing prohibition against respondeat superior. And Monell, it was clearly established that city governments will not be liable for respondeat superior and the court is well aware in a long line of decisions in this court that that is, in fact, the beginning spot, no respondeat superior liability. And in this case, when you're dealing with a hiring case, you are particularly in dangerous ground because, as the Supreme Court, I believe, states, it is in this particular case that the actual hiring, the action of the city may, in fact, not be, in and of itself, unconstitutional in the hiring action. It only becomes unconstitutional down the line if an officer commits one of these offenses and then we go back and say you should have done a more thorough investigation. The level of investigation, though, is not a constitutional requirement and when faced with those things on, with those questions on several occasions, this court has decided not to impose such things as criminal investigations and certain particular issues that may have seemed good and right in one case, but, in fact, would not make a, would not be a wise move to invoke those or to make those to be a constitutional requirement because, as the court said, it then puts the, puts the cities in a position of trying to do an endless task of trying to meet these constitutional requirements and it also runs a very serious risk of federalism. I think it is best said in, by the Supreme Court in the Bryan case where they clearly say that only for adequate scrutiny of the applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right. Can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference? In this case, deliberate indifference is still the standard and it requires a city actor, a municipal actor, a policymaker to make a conscious decision to do something that is deliberately indifferent to the constitutional right of a third party. That's not what happened here. In this case, Chief Mitchell reviewed the background. He saw nothing to connect the background of Officer Fiero to the risk, the high risk of an excessive force or unlawful arrest and the man was hired. He was not, there was no excessive force claim in the city of Ferris. In fact, what Chief Love said whenever he was deposed is that he ultimately did not find excessive force. Mr. Spencer, you've got a red light. I'll let you finish your sentence if you want to finish your sentence, sir. I think I've finished. All right, thank you, sir. I didn't mean to cut you off. I think we've got your argument, though. Thank you. Thank you, sir. All right, Ms. Branscom, you had a right to rebuttal if you like. Well, Your Honor, first let me say I think Zerno was exceptionally well written and it's not an outlier. Your Honor, I would like to just tweak something that Mr. Vincent said. We really, I really was not trying to use the city of Dallas complaints to show that inconclusive really meant that it was a finding. The purpose of doing that was Chief Mitchell testified that inconclusive meant no evidence whatsoever, and I was simply making the point that with the affidavit from the Dallas sergeant, that was not the case. But, Your Honors, I'd like to use the rest of my time to simply draw your attention to some facts that I will concede I'm not asking you to consider for this case. But in her affidavit, it's in the record at 560. In her affidavit, she went through seven years of data for excessive force complaints, allegations against Dallas police officers. Seven years. She found 1,189 allegations of excessive force. The who? Sergeant Nancy Felix. She's the sergeant in charge of the records. She was required in another case to analyze this data, the seven years of data. And the pertinence of that is? Simply, Your Honor, of the 1,189 complaints, 25 were sustained. 25 out of 1,189. That's 98% of the time citizen complaints over a period of seven years were not sustained. So 98% of the time the citizen was not believed and the officer was believed. The officer was not believed only 2% of the time. So, Your Honors, in your great wisdom, you place a tremendous store on sustained findings, and I am not questioning that, but I simply am drawing your attention to facts. I don't know if anyone has ever brought those facts to your attention, but I'd like to do that now. Thank you very much, Your Honors, for your time and attention. Counsel, let me ask about that affidavit. Is that affidavit part of the record of this case? Yes, sir. It's 560 through 565. Thank you. But none of that smaller percentage embraces the complaints that were filed against the chief here. Is that right? Actually, two of the inconclusive complaints about Officer Fiera are included in that seven-year time span. So two of his are in there, of the 1,189. So you fall into the greater percentage of inconclusive, right? Yes, sir. All right. All right. Thank you, Ms. Boston. We appreciate your briefing and your advocacy, Mr. Vincent. Likewise, appreciate both of you coming to argue the case.